Filed 12/2/21  Cultivation Technologies v. Duffy CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CULTIVATION TECHNOLOGIES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JAMES DUFFY et al., <br><br> Defendants and Appellants. | G059457 <br><br> (Super. Ct. No. 30-2019-01120155) <br><br> ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on November 12, 2021, be modified as follows:

On page 1, the superior court case number read 30-2019-001120155 but is now changed to read 30-2019-01120155.

This modification does not change the judgment.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CULTIVATION TECHNOLOGIES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JAMES DUFFY et al., <br><br> Defendants and Appellants. | G059457 <br><br> (Super. Ct. No. 30-2019-001120155) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed in part and reversed in part.

Lockett + Horwitz, Lawrence Horwitz and Ryan Thomason for Plaintiff and Appellant.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Defendants and Appellants.

Earlier this year we considered three consolidated appeals concerning Cultivation Technologies, Inc.'s (CTI) motion to disqualify the Catanzarite Law Corporation (Catanzarite), in two related cases. (*Fincanna v. Cultivation Technologies, Inc.* (June 28, 2021, G058700) [nonpub. opn.] (*Fincanna*).) We affirmed the trial court's determination Catanzarite could not represent the following parties: (1) CTI; (2) three CTI subsidiaries; and (3) a group of CTI shareholders bringing a derivative lawsuit (which included James Duffy and Amy Cooper). (*Ibid.*)

After Catanzarite's disqualification, CTI filed a lawsuit against Cooper, Duffy, and Catanzarite (referred to collectively as the Faction, unless context requires otherwise). The complaint alleged Cooper and Duffy were liable for breach of fiduciary duty, intentional and negligence interference with economic relations, and intentional interference with contractual relations. The court granted their special motion to strike (anti-SLAPP motion) (Code Civ. Proc., § 425.16)[1] as to all the causes of action except breach of fiduciary duty. CTI alleged Catanzarite was liable for breach of fiduciary duty and legal malpractice. The court denied Catanzarite's anti-SLAPP motion in its entirety. All parties appealed.

We affirm the trial court's orders denying Catanzarite's anti-SLAPP motion and Cooper and Duffy's motion regarding CTI's breach of fiduciary duty claim. We reverse the trial court's orders granting Cooper and Duffy's anti-SLAPP motion regarding the remaining claims, concluding they qualify as mixed causes of action that require a claim by claim approach, rather than evaluating each cause of action as a whole. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).) Because CTI's complaint lacks specificity with respect to the contents of the published e-mails giving rise to the alleged actionable misconduct, we direct the trial court on remand to permit

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

2

CTI to amend its complaint. CTI must set forth only allegations (discussed later in this opinion) that support its claims for recovery but do not rest on protected activity.

FACTS

I. *Background Facts*[2]

Like the *Fincanna* appeal, this appeal arises from the ongoing battle between two groups of shareholders over who controls CTI.[3] Shareholders of Mobile Farming Systems, Inc., (MFS), formed CTI, a "distinct and separate" business entity. Cooper and Duffy were shareholders of both entities. CTI began to quickly experience economic success, whereas MFS "struggled financially and ultimately ceased operations in . . . 2016."

Cooper and Duffy, seeking a bigger stake in, and control of CTI, asserted MFS was entitled to 100 percent of CTI's stock. They hired Catanzarite to file multiple shareholder derivative lawsuits aimed at gaining more control over CTI. They also took steps to expel the elected board members (referred to as the Probst Faction) and communicated directly with CTI's business associates to interrupt the Probst Faction's business plans for the corporation.

For example, in January 2019, Cooper and Duffy "caused" Catanzarite to publish a fraudulent written consent removing CTI's board of directors and replacing it with three new directors (Duffy, Mo Zakhireh, and Richard O'Connor). The following month, CTI through its "duly elected" board members, ignored the Faction's written consent and executed a letter of intent to complete a reverse takeover merger with a

---

[2]     Our factual summary is a compilation of allegations of the operative complaint, declarations, and other evidence submitted in support of the anti-SLAPP motion. (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 249.) It should go without saying that these are not litigated facts nor findings, and we imply no view on what actually happened in this case.

[3]     This issue is to be decided as part of the shareholder derivative/class action *Mesa, et al. v. Probst, et al.,* OCSC No. 30-2019-01064267 (the Mesa Action).

Canadian corporation, Western Troy Capital Resources, Inc. (Western Troy). A few days later, Western Troy publicly announced the merger on its Web site. The merger would have meant CTI's shares would be listed publicly on the Canadian stock exchange "at a time when public cannabis companies in Canada often traded at multiples of up to 80X revenue" raising CTI's "potential valuation between $175,000,000 and $240,000,000."

Cooper and Duffy recognized this merger would "interfere with MFS shareholders' false assertion MFS" owned all of CTI's shares. They took action to stop the merger. They "caused Catanzarite" to send Western Troy an e-mail on the same day the company publicly announced the merger. The e-mail falsely stated CTI's board had been replaced and the new directors disputed and objected to the merger. The e-mail asserted CTI's management had not agreed to the merger described on Western Troy's Web site, especially since it was a "valueless" company. Thereafter, Western Troy withdrew from the merger deal. CTI's complaint alleged the Faction sent this e-mail "with the express design and intent to injure CTI through killing the Western Troy merger."

Also in January 2019, Cooper and Duffy "acting through" Catanzarite, sent CTI's largest secured creditor, Fincanna Capital Corporation (Fincanna), an e-mail stating future modifications or agreements between them must be signed by the new board members (O'Connor, Zakhireh, and the chief financial officer and secretary, Duffy).

During the same month (January 2019), Catanzarite filed a lawsuit for MFS asserting CTI was MFS's subsidiary and seeking cancellation of CTI's shares (the MFS Action). MFS asserted specific CTI board members were liable for various misdeeds including conversion and misappropriation of trade secrets because MFS owned CTI. MFS alleged the elected board refused to acknowledge the MFS shareholder's written consent removing and replacing them. In April 2019, the court ruled against the MFS shareholders, concluding MFS was not one of CTI's shareholders and could not vote in

4

CTI's elections. When this legal attack failed, Cooper and Duffy attempted to acquire control of CTI by once again executing fraudulent "written consents" removing CTI's elected board and replacing them with Cooper, Duffy, and O'Connor. This time the Faction attempted to oust the Probst Faction via proxy votes.

In the complaint, CTI (the Probst Faction) maintained the May 14, 2019, written consent was "based on fraud, deceit, and trickery." Specifically, the Faction used "at least one forged proxy vote in the name of CTI shareholder Carlos Calixto in order to bolster the votes they needed" to secure a majority. (Bold and underline omitted.) CTI alleged that Duffy, to effectuate the written consent, "with actual knowledge or reckless indifference for the truth, voted 2,720,000 shares which he did not own and were not registered in his name . . . ." (Bold and underline omitted.)

On May 23, 2019, a few days after this purported board takeover, Fincanna foreclosed upon CTI's assets, including its manufacturing and distribution subsidiaries. It filed a lawsuit against CTI. At the end of August 2019, Western Troy issued a press release stating that merger plans were terminated in July 2019.

CTI's elected board became involved in confidential negotiations to settle Fincanna's lawsuit and resume their business dealings. These efforts were thwarted when Catanzarite filed a cross-complaint against Fincanna and filed an answer "'on behalf' of CTI, though he had no authority to do so from CTI." At the time Catanzarite was representing multiple parties who were suing CTI.

Indeed, Catanzarite filed multiple lawsuits against CTI, creating a sense of instability. One lawsuit, filed on behalf of Cooper, sought a forced election and investigation into CTI's accounts (the Cooper Action). In addition to the MFS Action, Catanzarite filed the Mesa Action, another derivative/class action lawsuit designed to stop the Probst Faction from controlling CTI. Catanzarite also filed a declaratory relief action purporting to represent CTI against CTI's insurance company (the Scottsdale Action). The purpose of this litigation was to stop the insurance company from providing

5

a defense or indemnity to the Probst Faction defendants in the Mesa Action. In total, Catanzarite filed six lawsuits involving the shareholder dispute.

In October 2019, while Catanzarite was counsel of record for CTI in the Fincanna and Scottsdale actions, it filed a motion on behalf of the Mesa Action plaintiffs for the court to appoint a receiver over CTI. Thereafter, CTI expended a great deal of time and money to have the court disqualify Catanzarite as its legal counsel. Soon thereafter, Catanzarite dismissed the Scottsdale Action but asserted it still represented CTI's subsidiaries.

CTI filed the underlying complaint against the Faction before the trial court ruled on its disqualification motions.[4] CTI alleged, "[The Faction's] actions of publishing two wholly improper [w]ritten [c]onsents, one of which included a forged proxy and a representation that [Duffy] voted 2,720,000 shares which in reality were not owned by him, have damaged CTI by causing the merger with Western Troy to fall through, and causing CTI's largest creditor to foreclose on CTI's assets in ongoing litigation which CTI has not been able to settle due to the unauthorized [c]ross-[c]omplaint filed by [Catanzarite]." In addition, the complaint alleged CTI had been damaged by Catanzarite's "manifestly unethical adverse actions taken against CTI while CTI was his own client of record in pending litigation." CTI alleged it had been injured in excess of $100,000,000.

II. *Anti-SLAPP Motion*

Catanzarite filed a separate anti-SLAPP motion from Cooper and Duffy (although Catanzarite acted as legal counsel for Cooper and Duffy). Catanzarite asserted CTI's causes of action against the law firm and lawyers violated section 425.16 because they arose from protected speech and petitioning activity. It added CTI could not prevail on the merits because in the complaint "it maintains it did not retain Catanzarite . . . or

_____

[4] As discussed in our opinion in *Fincanna, supra,* G058700, the court correctly disqualified Catanzarite from representing these parties.

6

authorize Catanzarite . . . to act on its behalf." It argued that absent an attorney client relationship, CTI could not prevail on its claims for breach of fiduciary duty and attorney malpractice.

Cooper and Duffy's motion alleged CTI's causes of action against them arose from "protected speech and petitioning activity, i.e., pleadings, statements and writings in connection with judicial proceedings." In addition, they asserted CTI could not succeed on the merits because the claims were based on activity protected by the litigation privilege. Moreover, CTI could not prevail on the breach of fiduciary duty claim based on the premise Cooper and Duffy owed a fiduciary duty as corporate officers because CTI also alleged they were never directors.

CTI opposed the motions, arguing the case "directly [arose] from the unethical conduct of a rogue lawyer" who simultaneously represented parties that were suing each other, but was now claiming the conduct was protected petitioning activity. CTI argued the publishing of fraudulent shareholder consents and misleading e-mails were not in furtherance of a right to petition. In addition, any reference to the filing of lawsuits and cross-complaints "were merely incidentally used to illustrate how far [the Faction was] willing to go to derail and interfere with CTI's business and opportunities."

III. *The Court's Ruling*

The court determined CTI's claims for breach of fiduciary duty and malpractice did not arise out of protected activity. It determined CTI's claims related to "the conflicts of interest created by Catanzarite's representation of adverse parties and . . . Duffy and Cooper's alleged positions as members of [CTI's] Board of Directors." It determined the remaining causes of action alleged against Duffy and Cooper related to e-mail communications to Western Troy and Fincanna about a legal dispute regarding rightful control over the corporation. The court noted the e-mails attached copies of the MFS Action complaint. Because the causes of action "center on communications in connection with an issue under consideration in at least one of the six cases" the court

7

concluded they arose "out of protected speech, specifically under . . . section 425.16, subdivision (e)(2) concerning statements made in legal proceedings." The court added, CTI failed to establish a probability of prevailing on these causes of action due to the litigation privilege. Finally, the court denied CTI's request for attorney fees.

DISCUSSION

I. *Applicable Law and Standard of Review*

Section 425.16 authorizes a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance by allowing defendants "to request early judicial screening of legal claims targeting free speech or petitioning activities." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880.)

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16, and if the defendant makes this showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. [Citation.] On appeal, we review the trial court's ruling on the anti-SLAPP motion de novo. [Citation.]" (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 311-312 (*Wittenberg*).)

II. *First Step—Liability Arising from Protected Activity*

Section 425.16, subdivision (b)(1) (section 425.16(b)(1)), provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

8

"A claim arises from protected activity when that activity underlies or forms the basis for the claim. [Citations.]" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062-1063 (*Park*).) "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id*. at p. 1063.)

"Consequently, '[i]n deciding whether the "arising from" requirement is met, a court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b).)' [Citation.] Thus, we are 'not limited to examining the allegations of the complaint alone but rather consider[] the pleadings and the factual material submitted in connection with the special motion to strike.' [Citations.]" (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 111 (*Optional Capital*) ["The 'gravamen is defined by the *acts on which liability is based*, not some philosophical thrust or legal essence of the cause of action'"].)

## A. *Catanzarite's Anti-SLAPP Motion*

CTI's basis for liability, for breach of fiduciary duty and legal malpractice, was Catanzarite's unethical conduct in helping Duffy and Cooper illegally gain control of CTI and by improperly acting as CTI's appointed counsel while representing entities suing CTI. Catanzarite inserted itself as corporate counsel while at the same time conspiring with a faction of shareholders seeking to oust elected board members. As noted earlier, this court affirmed the trial court's decision to disqualify Catanzarite from further representation of CTI, CTI's subsidiaries, and the Mesa Action plaintiffs due to unwaivable conflicts of interests. (*Fincanna, supra,* G058700.)

"'Filing a lawsuit is an exercise of one's constitutional right of petition, and statements made in connection with or in preparation of litigation are subject to section 425.16.' [Citation.] Thus, a cause of action arising from acts committed by attorneys in

9

representing clients in litigation may appropriately be the subject of an anti-SLAPP motion. [Citation.] However, a client's action against his or her attorney, whether it is pleaded as a claim for malpractice, breach of fiduciary duty, or any other theory of recovery, is not subject to the anti-SLAPP statute 'merely because some of the allegations refer to the attorney's actions in court.' [Citation.] When the allegations referring to litigation activity ""'are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute.'"" [Citation.]" (*Wittenberg, supra,* 50 Cal.App.5th at pp. 312-314.)

For example, in *Freeman v. Schack* (2007) 154 Cal.App.4th 719 (*Freeman*), plaintiffs sued their former attorney for breach of contract, breach of fiduciary duty, and negligence, alleging counsel abandoned them to represent adverse interests in the same and different litigation. (*Id.* at p. 722.) The appellate court reversed the order granting the attorney's anti-SLAPP motion on the grounds that violations of the State Bar Rules of Professional Conduct were not constitutionally protected. It reasoned the "principal thrust of the conduct underlying [the plaintiffs'] causes of action is not [the attorney's] filing or settlement of litigation[,]" but rather "his undertaking to represent a party with interests adverse to plaintiffs, in violation of the duty of loyalty he assertedly owed them." (*Id.* at p. 732.) The court recognized, "'[I]f the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion.' [Citation.]" (*Id.* at p. 732.)

Catanzarite attempts to distinguish this case from other anti-SLAPP case authority involving malpractice lawsuits. It asserts this is not a "'garden variety' attorney malpractice action" (*Freeman, supra,* 154 Cal.App.4th at p. 732) because the complaint repeatedly alleges Catanzarite was not really CTI's attorney. As discussed in our recent *Fincanna* opinion, Catanzarite's authority and role as corporate counsel remains a hotly

10

disputed issue and the answer depends on resolution of the much larger and more-complicated issue of which faction of shareholders rightfully controls CTI. We concluded in *Fincanna* that because the two shareholder factions retained different legal counsel to represent CTI, the fiduciary duty at stake was loyalty, and therefore, CTI had standing to file the motion to disqualify attorneys hired by members of one faction. (*Fincanna, supra*, G058700.) "Due to the undisputed contentious nature of their dispute, it would be absurd to suggest the same attorney could simultaneously represent these two factions of shareholders. Similarly, there was no need to determine which faction controlled CTI to disqualify an attorney simultaneously purporting to act as corporate counsel while pursuing a derivative action filed against the corporation. If the interests of these two clients were in accord, there would be no need for a derivative action. [Citation.]" (*Ibid.*)

In addition, we need not resolve the factual dispute of Catanzarite's status as corporate counsel to review the anti-SLAPP ruling. "[M]erits based arguments have no place in our threshold analysis of whether [CTI's] causes of action arise from protected activity." (*Freeman, supra,* 154 Cal.App.4th at p. 733.) If Catanzarite cannot meet its threshold showing, the fact it "'might be able to otherwise prevail on the merits under the "probability" step is irrelevant.' [Citation.] Nor do [its] arguments show how [its] evidence defeats [CTI's] claims as a matter of law. [Citation]" (*Ibid.*)

We conclude that while the complaint disavows the existence of a proper attorney-client relationship with Catanzarite, the complaint also asserts Catanzarite filed a complaint and answer on CTI's behalf. As mentioned, we recently affirmed the trial court's ruling Catanzarite may no longer represent CTI or its subsidiaries. Catanzarite's disqualification was mandatory because it was simultaneously representing clients with conflicting interests. (*Fincanna, supra*, G058700.) It is improper for Catanzarite to now suggest this unethical conduct is somehow protected petitioning activity. We affirm the trial court's ruling as to Catanzarite.

11

B. *Cooper & Duffy's Anti-SLAPP Motion*

As aptly stated by CTI, the claims against Cooper and Duffy fall into the following two categories: (1) those claiming interference with a prospective business advantage/contract (Interference Claims); and (2) those concerning breach of fiduciary duty (Fiduciary Claims). The trial court determined the Interference Claims were subject to anti-SLAPP, but the Fiduciary Claims were not.

In their motion, Cooper and Duffy asserted all the claims were subject to the anti-SLAPP statute because they were based on allegations concerning published writings made in connection with judicial proceedings. They asserted, "The common thread of all the allegations against Cooper and Duffy is that they were engaged in petitioning activity advancing the Copper/Duffy Board's interests in court."

Protected activity includes a writing made "in connection with an issue under consideration" by a court. (§ 425.16, subd. (e)(2).) "A statement is 'in connection with' an issue under consideration by a court in a judicial proceeding . . . if it relates to a substantive issue in the proceeding and is directed to a person having some interest in the proceeding. [Citation.]" (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1167.) Thus, there are two components we must consider. First, did the published writings at issue in this case relate to a substantive issue in the pending MFS Action. Second, were these statements directed at persons having some interest in the proceeding.

i. *Interference Claims*

CTI's Interference Claims involved different types of misconduct. First, CTI asserted Cooper and Duffy had Catanzarite publish to shareholders two fraudulent and legally ineffective written consents purporting to remove and replace CTI's board. Second, Cooper and Duffy, through Catanzarite, sent e-mails to Western Troy and Fincanna containing false information about who controlled CTI. Thus, CTI alleged multiple factual bases support their claim Cooper and Duffy interfered with their business relationships with Western Troy and Fincanna.

12

Our Supreme Court in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 382 (*Baral*), addressed how a court should proceed when a plaintiff has pleaded what is commonly referred to as a "'mixed cause of action.'" "[W]e conclude that the Legislature used 'cause of action' in a particular way in section 425.16(b)(1), targeting only claims that are based on the conduct protected by the statute. Section 425.16 is not concerned with how a complaint is framed, or how the primary right theory might define a cause of action. While an anti-SLAPP motion may challenge any claim for relief founded on allegations of protected activity, it does not reach claims based on unprotected activity." (*Ibid.*) The Supreme Court considered and disapproved case authority holding an anti-SLAPP "motion lies *only* to strike an entire count as pleaded in the complaint." (*Ibid.*)

Our Supreme Court recently clarified the scope of analysis of an anti-SLAPP motion as not being "confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]" (*Bonni, supra,* 11 Cal.5th at p. 1010.)

In *Bonni,* the Supreme Court clarified a court must take "a claim by claim approach . . . rather than attempting to evaluate a cause of action as a whole" regardless of whether the motion moved to strike an entire cause of action or "merely parts of it." (*Bonni, supra,* 11 Cal.5th at pp. 1010-1011.) The court refused to "risk saddling courts with an obligation to settle intractable, almost metaphysical problems about the 'essence' of a cause of action that encompasses multiple claims. [Citation.]" (*Id.* at p. 1011.) The court clarified that not every court that has labeled its approach as a gravamen test after *Baral* has errored, because a court may determine if particular acts alleged "supply the elements of a claim [citation] or instead are incidental background [citations]. This approach is consistent with *Baral*, which reaffirmed that '[a]ssertions that are "merely

13

incidental" or "collateral" are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statue.' [Citation.]" (*Id.* at p. 1012.)

In light of the above, we first consider whether CTI's various allegations of misconduct supply context or the elements of CTI's Interference Claims. Next, each act alleged as a basis for relief must be analyzed separately under the two step anti-SLAPP framework. (*Bonni, supra,* 11 Cal.5th at p. 1021.) If the Faction meets its burden of showing the misconduct rests on protected activity, CTI must demonstrate there is some merit to its claim or those particular allegations can be stricken. (*Ibid.*)

a. *Publicized Written Consents*

The complaint alleges Cooper and Duffy published two written consents that falsely represented board members were removed and replaced. It alleged the written consents were fraudulent and legally ineffective. The complaint does not specify the manner of publication but there were allegations suggesting this misconduct in combination with e-mails and unauthorized lawsuits damaged CTI by causing the Western Troy merger to fall through, as well as Fincanna's foreclosure and litigation.

In their motion, Cooper and Duffy maintained the alleged interference regarding "the publication of written consents *to the shareholders* concerning the control of CTI" was a "substantive issue" in the MFS, Mesa, and Fincanna Actions. (Italics added.) They asserted a publication to third parties regarding the MFS Action, who had an interest in that litigation, qualified as protected activity. They explained paragraph 33 of the MFS Action's complaint illustrated Cooper and Duffy were the "rightful majority shareholders and control persons of CTI." They added, "The common thread of all the allegations against Cooper and Duffy is that they were engaged in petitioning activity advancing the Copper/Duffy Board's interests in court."

We conclude the published written consents do not relate to protected activity. The written consents, allegedly published to other CTI shareholders, apparently

14

announced the removal and replacement of CTI's board of directors.[5]  The validity of each written consent was not an issue being litigated in the MFS Action, which concerned liability related to misconduct committed by the Probst Faction.  Thus, publicized statements announcing new board members were not made in connection with, but rather independent from the MFS Action.  Although the lawsuit and the written consents were designed to produce the same result of placing MFS's shareholders in control of CTI's operations, the actions were independent and alternative remedies.  For example, there would be no need for the written consent if the Faction prevailed in the MFS Action, and vice versa.  Because the publication of the written consent notified shareholders about the status of the board of directors, not the pending litigation with MFS, it was not protected activity.

This conclusion does not end our analysis because CTI's Interference Claims fail to make a connection between the misconduct of publicizing the fraudulent written consents with the alleged damages caused by interrupting relationships/contracts with Western Troy and Fincanna.  CTI does not refute Cooper and Duffy's assertion the publication was only to CTI's shareholders.  It does not assert CTI was harmed by the shareholders knowledge or explain how the publication reached or negatively affected Western Troy or Fincanna.  It appears allegations regarding this fraudulent misconduct served to provide context about the depth of the dispute between the shareholder factions and the Fiduciary Claims.  We conclude the allegations regarding the written consents were not connected to any elements of the Interference Claims.  Thus, these particular allegations may be disregarded in considering the anti-SLAPP motion.

---

[5]        "Corporations normally function through their boards of directors, rather than their shareholders.  But there are a number of matters upon which shareholder action or approval is required or permitted.  [Citation.]"  (Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2021) ¶ 6:6.)  Under some circumstances directors can be elected without any meeting, by shareholder written consents.  But this method of election requires the unanimous written consent of all shares entitled to vote for directors.  (Corp. Code § 603, subd. (d).)

15

*b. Western Troy E-mail*

Catanzarite wrote a lengthy e-mail to Western Troy, warning the company it must speak with MFS's chief executive operating officer because there was currently litigation about whether MFS was CTI's sole shareholder. Catanzarite attached a copy of the MFS complaint to the e-mail. Catanzarite stated MFS disagreed with the merger and "we dispute and object to any agreement purportedly by and between Western Troy and CTI." (Bold and underline omitted.) Catanzarite demanded Western Troy withdraw its public notice about the merger and negotiate with MFS. Finally, Catanzarite insulted Western Troy. It started the e-mail by commenting it was unexpected the company did not have a receptionist to answer calls. Catanzarite noted Western Troy "appear[ed] to have no assets or operations of any value" and saw "no justification for Western Troy shareholders with a valueless company" to be entitled to CTI's shares via the merger. Catanzarite cut and pasted entries from Western Troy's Web site and called them "disturbing."

*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, is instructive. In that case, a company fired one of its employees because the employee stole customer lists and secretly solicited its customers to start a competing business. (*Id*. at 1259.) The letter informed customers the ex-employee may have already or may attempt to contact them and that to avoid involvement in the litigation customers should cease dealing with the ex-employee. (*Id*. at p. 1260.) Later, the company sued the fired employee, who asserted a cross-complaint for defamation based on statements made in the pre-litigation letters. The trial court granted the company's anti-SLAPP motion. (*Id*. at pp. 1260-1261.) The appellate court agreed, concluding the letters "related directly" to the employer's claims and were written to "persons whom [the employer] reasonably could believe had an interest in the dispute," and they did not contain any statements of fact that were not based on the employer's claim against the ex-employee. (*Id.* at pp. 1267-1268.) The

16

court held the letters were "'in connection with'" the employer's underlying claim against the ex-employee under section 425.16, subdivision (e)(2). (*Id.* at p. 1268.)

A similar connection can be made here. The e-mail warned Western Troy to no longer contact the Probst Faction because there was litigation challenging whether they still controlled CTI. The power struggle between CTI's shareholders certainly related to the MFS Action. Although Western Troy was not a party or witness in the litigation, it certainly had an interest in the dispute's outcome. If MFS prevailed the merger deal might not survive. The complaint alleges the e-mail was designed, in part, to make Western Troy question whether its deal with CTI was secure because there was infighting between board members. And in fact, Western Troy withdrew from the merger deal.

However, one important factor that distinguishes this case from *Neville* is the e-mail contained harmful statements of facts unrelated to the MFS Action. Simply stated, the e-mail harshly questioned whether Western Troy was a legitimate company, calling it "valueless." The elements of the interference with economic and contractional relations simply requires knowledge of the relationship/contract and intentional/negligent acts to disrupt the relationship causing damages. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 [intentional interference with prospective economic relations]; *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [interference with contractual relations].)

Arguably, if the insulting portion of the e-mail was sent, without any information about the MFS lawsuit, it could have had the desired effect of interfering with the merger plans. "As we observed previously, 'conduct is not automatically protected merely because it is related to pending litigation; the conduct must arise from the litigation.' [Citation.]" (*Optional Capital, supra,* 18 Cal.App.5th at p. 114; see *Paul v. Friedman* (2002) 95 Cal.App.4th 853, 867-868 [attorney's investigation into and disclosure of securities broker's private information not protected activity because

17

conduct not relevant to securities fraud at issue in arbitration proceeding]; see also *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 148 [no privilege when attorney for former employer wrote plaintiff's new employer stating plaintiff abused spouse because misconduct not reasonably relevant to threatened unfair competition litigation].) Thus, Catanzarite's disparaging comments may have been in connection with the lawsuit but were not relevant to an issue being reviewed in the MFS Action and therefore not protected activity.

We conclude the e-mail contains a mixture of protected and non-protected conduct. As stated in the *Baral* case, we must look at the protected activity and disregard the unprotected activity. (*Baral, supra,* 1 Cal.5th at p. 396.) We conclude Cooper and Duffy satisfied their threshold showing as to the Interference Claims, to the extent these claims were based on the e-mail's discussion of matters directly connected with the MFS Action. Because CTI sought relief based on allegations arising from protected activity, the second step is reached. Our analysis of the second prong will be provided later in this opinion.

### c. Fincanna E-mail

At first glance, Catanzarite's e-mail to Fincanna simply looks like a notification about CTI's newly installed board of directors. The e-mail explains the new board was interested in working with Fincanna. However, later in the e-mail Catanzarite reveals MFS was litigating its right to control CTI as the sole shareholder and it attached a copy of the complaint to the e-mail. The remaining and largest section of the e-mail is devoted to discussing statements written by Justin Beck on behalf of CTI. Catanzarite discusses Beck's suspension by the SEC and opines Beck's recommendations are suspect. While many of the statements in the e-mail are jumbled and difficult to understand, the concluding paragraphs stated the purpose of the e-mail was to inform Fincanna there "is a dispute as to who speaks for CTI that we seek to resolve on an expedited basis." They added, "It is our position that any modifications or agreements

18

between CTI and Fincanna at this point must be signed by" the newly installed officers (Zakhireh, O'Connor, and Duffy).

As was the case with the Western Troy e-mail, allegations regarding the Fincanna e-mail relate to both protected (the filing of the MFS Action) and unprotected (maligning current board members) activity. So here too, Cooper and Duffy satisfied the threshold showing on the Interference Claims to the extent they are based on communications "'in connection with'" the Faction's involvement in the MFS Action under section 425.16, subdivision (e)(2). (*Neville, supra,* 160 Cal.App.4th at p. 1268.) Our analysis of the second prong will be provided anon.

ii. *Fiduciary Claim*

The parties do not dispute board members generally owe a fiduciary duty. Cooper and Duffy assert the complaint alleges they were never CTI directors, and therefore, they did not owe a fiduciary duty to the other shareholders. They maintain they cannot be held responsible for their role in facilitating their attorney's malpractice in handling CTI's litigation. These arguments ignore the complaint's allegation Cooper and Duffy fraudulently claimed to be CTI board members and their misconduct directly related to actions taken in their role as purported board members. The complaint raises numerous allegations explaining how Cooper and Duffy, through their personal attorney, acted contrary to CTI's best interests by fraudulently ousting the elected board and destroying CTI's business relationship with Western Troy and Fincanna. For the same reasons the legal malpractice claims survive anti-SLAPP, these related breach of fiduciary duty allegations can remain.

C. *Second Step—Probability of Prevailing*

We have already determined Cooper and Duffy's e-mails satisfied their threshold showing as to the Interference Claims, to the extent these claims were based on e-mails discussing matters directly connected with the MFS Action. Having concluded CTI's Interference claims arose from protected activity—in part—we turn our attention

19

to the second step of the anti-SLAPP analysis.  A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323.)  Like the trial court, we conclude that the litigation privilege is applicable.

"The litigation privilege precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding.  '"The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." [Citation.]  The privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." [Citation.]'  [Citation.]  [¶] 'The purposes of section 47, subdivision (b), are to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation.  [Citation.]  To effectuate these purposes, the litigation privilege is absolute and applies regardless of malice.  [Citation.]  Moreover, "[i]n furtherance of the public policy purposes it is designed to serve, the privilege prescribed by section 47 [, subdivision (b)] has been given broad application." [Citation.]'  [Citation.]" (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1172, fn. omitted.)

*Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, 1055, is instructive.  Plaintiff's claims were based on defendants' acts of filing a complaint and sending an e-mail to potential customers about plaintiff's litigation tactics, to "'set the record straight'" about the lawsuit.  (*Id.* at p. 1054.)  A different panel of this court determined the e-mail's contents constituted "a litigation update, which describes the parties' contentions and court rulings, and is directed to individuals who had some

20

involvement in the parties' litigation." (*Id.* at p. 1055.)  After noting both section 425.16 and Civil Code section 47 must be construed broadly to protect the right of litigants, this court determined defendants met their burden of showing the e-mail fell within the parameters of anti-SLAPP legislation and plaintiffs could not show a probability of prevailing.  The court concluded the e-mail's statements all related to providing an update on the status of litigation, and even if they were not covered by the litigation privilege, they were insufficient to support a defamation cause of action.  (*Id.* at p. 1059.)

Here, the statements in Catanzarite's e-mails about an issue to be decided in pending litigation unquestionably come within the litigation privilege.  The e-mails contain statements that expressly refer to the litigation and each e-mail contained an attachment with a copy of the complaint.  The express purpose of each e-mail was to inform CTI's business associates about pending litigation and why the outcome could negatively affect CTI's future dealings with these third parties.  Thus, the e-mail was clearly a communication that had "some connection or logical relation to the action" as described in Civil Code section 47, subdivision (b).  CTI had no probability of prevailing because the litigation privilege would preclude liability.  CTI's allegations of protected activity supporting the Interference Claims do not survive anti-SLAPP.

DISPOSITION

We affirm the court's decision to deny Catanzarite's anti-SLAPP motion in its entirety.

We affirm the court's decision to deny Cooper and Duffy's anti-SLAPP motion as to CTI's Fiduciary Claims.

We reverse the court's decision to grant Cooper and Duffy's anti-SLAPP motion as to the Interference Claims because these causes of action are supported by a mixture of allegations regarding protected activity as well as non-protected activity. Following our Supreme Court's directive in *Baral and Bonni,* we do not confine our anti-

21

SLAPP analysis to determine whether an entire cause of action as pleaded has merit but take a claim by claim approach. (*Bonni, supra,* 11 Cal.5th at p. 1010.)

Currently, CTI's complaint refers generally to two e-mails sent to its business associates. On remand, the trial court is directed to permit CTI to amend its complaint to allege with specificity allegations supporting its Interference Claims that do not arise from protected activity. As described in the opinion, this would include the portions of the e-mails insulting Western Troy and maligning current board members. Because CTI has no probability of prevailing on allegations of protected activity (statements regarding which faction controls CTI due to the MFS Action), those claims for relief do not a survive the anti-SLAPP motion and must not be included in the complaint.

Respondents shall recover their costs on appeal.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

22